the perils of the seas, and were not comprehended in the terms of the bill of lading. He insists that the lumber and shingles were properly stowed; that at the commencement of the voyage the Columbus was properly officered, manned, and equipped, and was seaworthy in every respect; that on the voyage, in consequence of a violent gale of wind, the vessel sprung a leak, filled with water, and with the lumber on deck became unmanageable, and that in consequence thereof the danger was imminent that the lumber and shingles on deck would be lost; that there would be no danger to the vessel if the lumber on deck were thrown overboard, but that to save the same to the libelants he drove the vessel on shore, by which his vessel became greatly damaged, and his life and the lives of his crew were put in peril, and all for the purpose of saving the lumber and shingles for the libelants. For this service, which he claims to be in the nature of a salvage service, he claims he should be paid, and that he refused to deliver the lumber and shingles to the libelants because they refused to pay for such latter service.

The first question presented is, was the Columbus, at the commencement of the voyage, properly manned and equipped, and in every respect seaworthy? If she was not, then it is admitted by the respondent that the claim which he makes is unfounded, and that the decree as prayed for should be in favor of the libelants. The Columbus, with the lumber on board, sailed from Albany about the 22d of November, 1858. She proceeded on her voyage, stopping at various places as far as Norwalk Islands, where she arrived on Saturday evening, the 27th of November, and came to anchor for the night. Early in the morning, on Sunday the 28th of November, she again set sail, with a view to proceed on her voyage to New Haven. The weather at the time was cloudy. Early in the day it blew strong from the northeast, accompanied with thick snow. About 4 p. m. it was discovered that she was leaking. The water in the hold increased so fast that in about half an hour she filled. The lumber on board kept her from going to the bottom. After it became evident that she must fill with water, she was headed for the shore. She stuck on a sand bar near Stratford, where the lumber on deck was secured fast, and the crew went on shore. The leaks, so far as discovered, were occasioned by the opening of her seams occasioned by the strain produced by the winds and waves. The blow was not so violent as to occasion any loss to any portion of the deck load, or to occasion its shifting. None of the sails or rigging of the vessel were carried away. During the whole of the time she had her forward and main sail set with two reefs in them. These were all the sails she ever carried. Another vessel, of about the same size as the Columbus, laden with a cargo of lumber on deck and in the hold, from Albany, bound to New Haven,

was in the Sound on the same Sunday, and was in the storm, and arrived at her port of delivery that night without loss or damage.

From the evidence before the court I come to the conclusion that the Columbus was not seaworthy for the voyage, and that in consequence of such unseaworthiness the disaster that took place occurred. She had only three men on board all told; one of them, the cook, had lost one leg. This complement of men for a winter's voyage from Albany to New Haven, at a time when violent snowstorms are to be expected, in such a vessel, heavily laden as she was, with a cargo of lumber on deck and in the hold, was certainly insufficient. Prudent navigators go more strongly manned, although many navigators navigate their vessels with no more men than the Columbus had on board. In this respect she was unseaworthy.

In another respect she was unseaworthy. She was at least thirty-two years old. She had never been rebuilt. Though she had, a short time before the disaster, been repaired, many of her timbers and plank were rotten. The blow was not violent enough to open the seams of a staunch vessel in the way the seams of the Columbus were opened. After the disaster, she was not deemed fit to repair, and has been forsaken by her owner to go to destruction.

With this view of the case, without considering other questions that have been made, the decree must be in favor of the libelants.

---

LYON (HALSTED v.).　See Case No. 5,968.

---

## Case No. 8,648.

LYON v. NINE HUNDRED AND TWENTY-EIGHT BARRELS OF SALT.

[See Case No. 10,272.]

---

LYON (PECKHAM v.).　See Case No. 10,899.

LYON (UNITED STATES v.).　See Cases Nos. 15,650 and 15,651.

---

## Case No. 8,649.

### In re LYONS.

[2 Sawy. 524;[1] 19 Int. Rev. Rec. 78; 1 Am. Law T. Rep. (N. S.) 167; 1 Cent. Law J. 137.]

District Court, D. California.　Jan. 29, 1874.

MARRIED WOMEN ADJUDGED BANKRUPT.

By the laws of California a married woman living separate and apart from her husband is liable to suit on indebtedness contracted by her while so living. She may therefore be adjudged a bankrupt.

[Cited in Kinney v. Sharvey, 48 Minn. 96, 50 N. W. 1025.]

[See note at end of case.]

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]